**KAYDON ACQUISITION CORPORATION V, a Delaware Corporation, Plaintiff,**

v.

**AMERICA CENTRAL INDUSTRIES, INC., a/k/a ACI, Inc., an Iowa Corporation, Defendant,**

and

**America Central Industries, Inc., a/k/a ACI, Inc., an Iowa Corporation, Defendant/Counterclaimant,**

v.

**Kaydon Acquisition Corporation V, a Delaware Corporation, Defendant to Counterclaim.**

**No. C01–3063–MWB.**

United States District Court, N.D. Iowa, Central Division.

Dec. 12, 2001.

Richard H. Moeller, Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P.,

Sioux City, IA, for Kaydon Acquisition Corp. V.

Paul D. Lundberg, Hellige, Lundberg, Meis, Erickson & Frey, Sioux City, IA, Redge O. Berg, Berg and Howe, Spencer, IA, for American Central Indus., Inc.

## MEMORANDUM OPINION AND OR-DER REGARDING DEFEN-DANT'S COUNTERCLAIM FOR FORCIBLE ENTRY AND DETAIN-ER

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ...................................1026

II. FINDINGS OF FACT ...............................................1027

III. LEGAL ANALYSIS ...............................................1032
 A. Forcible Entry and Detainer ......................................1032
 B. Analysis Of Kaydon's Alleged Defaults ...............................1033
 1. Items no longer claimed to constitute a default .....................1033
 2. Certificate of insurance requirement ............................1033
 3. Acts causing increase in insurance rates .........................1034
 4. Environmental hazzards ....................................1035
 5. Damages to wall ..........................................1036
 6. Unauthorized alterations or modifications .........................1037
 a. The concrete pad ......................................1038
 b. The storage shed ......................................1039
 c. The door openings .....................................1039
 d. The removal of a section of wall .........................1039
 e. Modifications to the facility for new paint line ..................1040
 C. Analysis Of Whether Forfeiture Required ..............................1040

IV. CONCLUSION ...................................................1042

### I. INTRODUCTION AND BACKGROUND

On August 6, 2001, plaintiff Kaydon Acquisition Corporation V ("Kaydon") filed a complaint for declaratory judgment against defendant American Central Industries, Inc. ("ACI"). Plaintiff Kaydon is the lessee of an industrial premises owned by defendant ACI. Plaintiff Kaydon seeks a declaratory judgment that it is not in default under the terms of the lease between it and ACI. Plaintiff Kaydon also seeks a declaratory judgment that ACI is not entitled to evict it from the premises. Defendant ACI filed its answer in this matter on September 4, 2001. In its answer, defendant ACI denied plaintiff Kaydon's claims, and asserted a single counterclaim for forcible entry and detainer against Kaydon. ACI asserts in its counterclaim that Kaydon is in default under the terms of the lease because of the existence of nineteen uncorrected violations of

the lease. On November 14, 2001, defendant ACI filed an amended answer and counterclaim. In its amended counterclaim for forcible entry and detainer, ACI again requests that the court remove Kaydon from the premises. ACI also requests that the court award it money damages for damages to the premises and for any consequential damages resulting from Kaydon's alleged breach of the terms of the lease. ACI also requests money damages from Kaydon for breach of a separate Sales Representation Agreement. Finally, ACI seeks a declaratory judgment that a covenant not to compete in a sales agreement between ACI and Kaydon is unenforceable.

With respect to defendant ACI's counterclaim for forcible entry and detainer, trial was held on November 27, 2001, in Sioux City, Iowa. Plaintiff Kaydon was represented by Richard H. Moeller of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., Sioux City, Iowa. Defendant ACI was represented by Paul D. Lundberg of Hellige, Lundberg, Meis, Erickson & Frey, Sioux City, Iowa, and Redge O. Berg of Berg and Howe, Spencer, Iowa.

The court will begin with its findings of fact and then turn to its legal analysis and conclusions of law regarding defendant ACI's counterclaim for forcible entry and detainer.

## II. FINDINGS OF FACT

Plaintiff Kaydon is a corporation organized under the laws of the State of Delaware with its principal place of business in Ann Arbor, Michigan. Defendant ACI is an Iowa Corporation doing business in Pocahontas County, Iowa. ACI is owned by Lloyd Mefferd and Floyd Mefferd (collectively "the Mefferds" unless otherwise indicated).

On March 11, 1997, plaintiff Kaydon acquired Gold Star Manufacturing, Inc. ("Gold Star"), a wholly owned subsidiary of ACI for $4,781,896.27. The purchase price was based solely on the outstanding debt of Gold Star, which Kaydon assumed. Gold Star was engaged in the manufacture of hydraulic cylinders. Gold Star operated from a manufacturing facility in Laurens, Iowa, which had been constructed by the Laurens Industrial Foundation and leased to Gold Star pursuant to a lease agreement executed October of 1991.

Gold Star's manufacturing facility consisted of an 80x200 feet building which was constructed in 1986. An 80x200 feet addition to the building was constructed in 1990. A third addition, 50x200 feet, was made to the building in 1995. Each of the additions is an independent structure containing a manufacturing bay fastened to the other two structures. The Mefferds helped in the construction of Gold Star's manufacturing facility.

The building's construction was accomplished by means of bolting together a series of columns and beams that form the superstructure for the facility. The vertical columns are spaced twenty to twenty five feet apart. Girts then connect the columns on the side of the structure.[1] Prefabricated outside metal panels are attached to the girts. The roof of the structure consists of beams connected by purlins.[2] Prefabricated roof panels are attached to the purlins.

---

1. Girts are "[h]orizontal, secondary framing members attached (generally at a right angle) to endwall or sidewall to support wall coverings." www.nationalpostframe.com/terminology.

2. A purlin is "A horizontal structural member spanning between beams or trusses to support a roof deck." www.c-risk.com/reference_libraryBC_glossary.

At the time of the sale of Gold Star to Kaydon, Kaydon assumed possession of Gold Star's Laurens production facility under a short-term lease with ACI that was terminable by Kaydon on thirty days written notice. In November of 1997, ACI exercised an option to purchase the Gold Star manufacturing facility for $450,000 from the Laurens Industrial Foundation.

In early 1998 Kaydon and ACI commenced negotiations to enter into a longer term lease. On June 2, 1998, Kaydon and ACI entered into a written lease for the rental of an industrial premises located in Laurens, Iowa ("the Lease"). Section 6(c) of the Lease provides, in part, as follows:

> (c) TENANT'S DUTY OF CARE AND MAINTENANCE. Tenant shall, after taking possession of said premises and until the termination of this lease and the actual removal from the premises, at its own expense, care for and maintain said premises in a reasonably safe and serviceable condition, except for structural parts of the building. Tenant will furnish its own interior and exterior decorating. Tenant will not permit or allow said premises to be damaged or depreciated in value by any act or negligence of the Tenant, its agent or employees, ordinary wear and tear excepted. Without limiting the generality of the foregoing, Tenant will make necessary repairs to the sewer, the plumbing, the water pipes and electrical wiring, and all other component parts of the building and land, and Tenant agrees to keep faucets closed so as to prevent waste of water and flooding of premises; to promptly take care of any leakage or stoppage in any of the water, gas or water pipes. The Tenant agrees to maintain adequate heat to prevent freezing of pipes, if and only if the other terms of this lease fix responsibility for heating upon the Tenant. Tenant at its own expense may install floor covering and will maintain such floor covering in good condition. Tenant will be responsible for the plate glass in the windows of the leased premises and for maintaining the parking area, driveways and sidewalks on and abutting the leased premises, if the leased premises include the ground floor, and if the other terms of this lease include premised [sic] so described. Tenant shall make no structural alterations or improvements without the written approval of the Landlord first had and obtained, of the plans and specifications therefore.

Lease at ¶ 6(c).

The Lease also contains several provisions related to insurance. It provides, in relevant part that:

> 11. **Insurance** (a) Landlord and Tenant will each keep its respective property interests in the premises and its liability in regard thereto, and the personal property on the premises, reasonably insured against hazards and casualties; that is, fire and those items usually covered by extended coverage; and Tenant will procure and deliver to the Landlord a certification from the respective insurance companies to that effect. Such insurance shall be made payable to the parties hereto as their interests may appear. **TENANT SHALL PAY FOR ALL PREMIUMS FOR THE INSURANCE COVERAGE REQUIRED BY THIS LEASE, WHETHER LANDLORD'S OR TENANT'S RESPONSIBILITY.**
>
> (b) Tenant will not do or omit the doing of any act which would vitiate any insurance, or increase the insurance rates in force upon the real estate improvements on the premises.

Lease at ¶ 11(a)-(b).

On June 2, 1998, Kaydon and ACI also entered into an addendum to the Lease

("The Addendum"). The Lease was to run from June 1, 1998, through May 31, 2000, and called for monthly rental payments of $9,885.00. The Addendum provided that the Lease would automatically renew for ten successive one-year terms. Thus, under the Addendum the Lease would run through May 31, 2010.

Paragraph 1 of the Addendum provides as follows:

1. Only Tenant shall have the right to terminate this lease without cause or Landlord default. Landlord shall have the right to terminate this lease only in the event of Tenant default in performance of its obligations contained in this lease. In accordance with terms of this paragraph, Landlord and Tenant shall each give the other six (6) months notice of its intention to terminate the lease. The 6–month notice shall run from the day the notice is sent, Certified Mail–Return Receipt Requested, and the monthly rental and other expenses shall be paid in full during said 6–month period. It is further agreed that 6–month notice of termination provided to Tenant cannot be given until eighteen (18) months of the initial 24–month lease term have expired. Any other 6–month notice of termination shall expire six (6) months after receipt, and Tenant shall pay all amounts provided for in the lease until the expiration of the 6–month period.

The Addendum at ¶ 1.

After the Lease was executed, Kaydon invested considerable capital expenditures into the Laurens facilities to upgrade and modernize the facility. Specifically, Kaydon removed the paint line that was currently in the plant and installed a new paint line. The cost of the new paint line was slightly less than $1,000,000. This necessitated several modifications be made to the plant. Kaydon removed approximately 70 feet of wall from the center bay in order to accommodate the rail system for the new paint line. The removal of the wall section also necessitated the removal of at least two girts.[3] The manager of Kaydon's Laurens facility does not know what happened to the sheet metal removed from the wall. Approximately 200 one inch in diameter holes were drilled through the concrete floor of the facility in order to anchor the paint line. The new paint line also required that a hole for a vent shaft three feet in diameter be cut into the roof of the structure and holes be cut into the steel beams in the structure in order to run electrical conduit through them. The holes drilled in the beams in the plant could effect the strength of the beams. Other than the floor anchors and the ventilation roof shafts, the parts of the new paint line are not attached to the structure of the building. These modifications have not effected the overall structural integrity of the building.

Two five feet wide door openings were also cut into the south wall of the plant's north bay. These door openings were made to permit easier entrance into the bay with materials and egress with finished product. These two door openings required the removal of two girts, one for each door. The door openings, however, have not effected the structural integrity of the building.

Kaydon also constructed a 10x20 feet concrete pad near the manufacturing facility. The concrete pad supports two storage tanks for liquid oxygen and argon.

---

**3.** The removal of the section of the wall may also have caused the removal of an X-brace. The record, however, does not reveal whether an X-brace was located on that wall. An X-brace consists of cables running from the top of a wall to the bottom of it forming an X. An X-brace provides stability to a structure.

Kaydon also constructed a storage shed on the property of the manufacturing facility. The three-sided storage shed is approximately 22x60 feet with a six inch concrete base. The shed is used to store metal shavings from the plant in order to keep them out of the elements. Before Kaydon purchased Goldstar, metal shavings at the plant were stored inside the plant itself. The shavings were then placed in the plant's garbage and taken to a landfill. In the last year before Goldstar's sale to Kaydon, Goldstar commenced selling its scrap steel. To facilitate this, the purchaser of the scrap steel left large metal hoppers outside Goldstar's manufacturing facility. Goldstar then placed its metal shavings in these hoppers for pickup. A similar practice was followed by Kaydon after the purchase of Goldstar. Kaydon placed its metal shavings from the Laurens facility in trailers outside the plant. The trailers, however, were not protected from the elements. This permits the oil and coolants on the shavings to run off onto the ground.[4] The shed was constructed in order to prevent this from occurring by keeping the metal shavings out of the elements.

In early February, 2001, during an aerial inspection of the Laurens manufacturing facility, Lloyd Mefferd observed the hole cut in the roof of the facility for the ventilation shaft.[5] The Mefferds then requested permission to inspect the manufacturing Goldstar facility. Kaydon agreed to the inspection and on February 24, the Mefferds met at the leased premises with Lars Hersom, the general manager of the Laurens operation, to inspect the facilities. During the tour the Mefferds expressed their disapproval to a number of physical

changes to the building and concern that Kaydon had not obtained the Mefferds' consent pursuant to Section 6(c) of the Lease. Hersom was unaware of the Lease requirement that called for Kaydon not to make structural alterations or improvements without the written approval of the Mefferds.

On February 26, 2001, the Mefferds sent a certified letter to Kaydon outlining the following nineteen alleged defaults of the Lease:

1. There is a cement pad, located on the south side of the building which has been installed by Kaydon, and is being used to store liquid oxygen and liquid argon. This is an infraction of Paragraph 6(c) of the lease agreement.

2. There is a storage shed, located to the southwest corner of the main building, which was built by Kaydon, and is being used to house metal boxes for the storage of shavings and scrap metal. This is an infraction of Paragraph 6(c) of the lease agreement.

3. The storage building located on the southwest corner of the leased premises, is missing two doors allowing the weather elements to enter the inside of the building. This is an infraction of Paragraph 6(c) of the lease agreement.

4. The ceiling panels and walls in the offices have not been cleaned and are turning brown with welding smoke. This is an infraction of Paragraph 6(c) of the lease agreement.

5. The roof in the upper offices, mainly in the conference room in the engineering/sales dept. has severe water leaks.

---

4. When ACI was operating Goldstar it used petroleum based coolants in the manufacturing process. Kaydon switched to water soluble coolants which are more environmentally friendly.

5. Lloyd Mefferd is a licensed helicopter pilot.

This is an infraction of Paragraph 6(b) of the lease agreement.

6. The west wall, located in the north bay, of the main building, has been dented or punctured numerous times. This is an infraction of Paragraph 6(b) of the lease agreement.

7. There has been a 5 foot door opening, located in the south wall, of the north bay, at the east end, cut through the original wall of the main building. This is an infraction of Paragraph 6(c) of the lease agreement.

8. There has been a 5 foot door opening, located in the south wall, of the north bay, at the west end, cut through the original wall of the main building. This is an infraction of Paragraph 6(c) of the lease agreement.

9. The Air Conditioners for the main building (production area) are not in operable condition. This is an infraction of Paragraph 7(b) of the lease agreement.

10. The PMW automatic barrel washer has overflowed numerous occasions causing water damage to the lower level office floors and walls. This is an infraction of Paragraph 6(c) of the lease agreement.

11. Kaydon has located several signs on the premises without written approval from ACI. This is an infraction of Paragraph 17(a) (4) of the lease agreement.

12. There has been 70 foot of the south wall, of the center bay, removed. This is an infraction of Paragraph 6(c) of the lease agreement.

13. There has been an opening for a vent fan cut through the south wall, at the west end, of the south bay, of the main building. This is an infraction of Paragraph 6(c) of the lease agreement.

14. Numerous holes have been drilled through the floor of the south bay, east end, of the main building, for steel poles for a paint system installed by Kaydon. This is an infraction of Paragraph 6(c) of the lease agreement.

15. Numerous holes have been cut through the roof of the south bay, east end, of the main building, for a paint system installed by Kaydon. This is an infraction of Paragraph 6(c) of the lease agreement.

16. Numerous attachments of steel beams, poles, and electrical conduit has been made to the building for a paint system by Kaydon. This is an infraction of Paragraph 6(c) of the lease agreement.

17. Kaydon/Gold Star has not provided a certificate of insurance as provided for in Paragraph 11(a) of the lease agreement.

18. With the installation of the paint system we believe that this is an infraction of Paragraph 11(b) of the lease agreement.

19. Kaydon has allowed spillage's [sic] of cutting oils, water soluables [sic], and paint solutions on the premises; (see letter to Sam Amour, dated 4–20–2000). This is an infraction of Paragraph 6(d) of the lease agreement.

Letter of Feb. 26, 2001, at pp. 1–3. The Mefferds' letter further indicated that the Lease would terminate six months after the date of the letter.

Since receiving the Mefferds' letter, Kaydon has addressed several items listed in the letter as alleged defaults of the Lease. Kaydon has made office improvements, including replacement of carpet and ceiling tiles. Kaydon has also replaced the air conditioners on the premises and the doors of the storage shed. Kaydon has also repaired leaks in the roof. The costs of these improvements to the manufacturing facility total approximately $90,000. On April 1, 2001, Kaydon obtained insur-

ance on the premises and the property located on the premises in the sum of $3,109,848. The insurance certificate states that the property is "LEASED BY SEABEE CORPORATION FROM AMERICAN CENTRAL INDUSTRIES, INC. LOCATED AT HIGHWAY 10 WEST, LAURENS, IOWA." Certificate of Insurance at p. 1.

## III. LEGAL ANALYSIS

### A. Forcible Entry and Detainer

■ Under Iowa law, the remedy of forcible entry and detainer is purely statutory. *Ashpole v. Delaney*, 217 Iowa 792, 794, 253 N.W. 30, 31 (1934). The six grounds for a forcible entry and detainer action are set out in Iowa Code section 648.1:

1. Where the defendant has by force, intimidation, fraud, or stealth entered upon the prior actual possession of another in real property, and detains the same.

2. Where the lessee holds over after the termination of the lease.

3. Where the lessee holds contrary to the terms of the lease.

4. Where the defendant continues in possession after a sale by foreclosure of a mortgage, or on execution, unless the defendant claims by a title paramount to the lien by virtue of which the sale was made, or by title derived from the purchaser at the sale; in either of which cases such title shall be clearly and concisely set forth in the defendant's pleading.

5. · For the nonpayment of rent, when due.

6. When the defendant or defendants remain in possession after the issuance of a valid tax deed.

IOWA CODE § 648.1.

■ A forcible entry and detainer action is tried in equity. IOWA CODE § 648.5;

see *Petty v. Faith Bible Christian Outreach Ctr., Inc.*, 584 N.W.2d 303, 306 (Iowa 1998); *Powell v. Grewing*, 562 N.W.2d 761, 762 (Iowa 1997); *Rowan v. Everhard*, 554 N.W.2d 548, 549 (Iowa 1996); *Bernet v. Rogers*, 519 N.W.2d 808, 810 (Iowa 1994); *Hillview Assocs. v. Bloomquist*, 440 N.W.2d 867, 869 (Iowa 1989); *Sunset Mobile Home Park v. Parsons*, 324 N.W.2d 452, 454 (Iowa 1982); *Steele v. Northup*, 168 N.W.2d 785, 787 (Iowa 1969); *Beck v. Trovato*, 260 Iowa 693, 697, 150 N.W.2d 657, 659 (1967); *Bentler v. Poulson*, 258 Iowa 1008, 1010, 141 N.W.2d 551, 552 (Iowa 1966). The object of Iowa's forcible entry and detainer statute "is to enable a person entitled to the possession of real estate to obtain such possession from any one illegally in the possession of same." *Ashpole*, 217 Iowa at 794, 253 N.W. at 31; accord *Rudolph v. Davis*, 239 Iowa 372, 374, 30 N.W.2d 484, 486 (1948). The statute is to be given "a liberal construction with a view to promote its object." *Ashpole*, 217 Iowa at 794, 253 N.W. at 31; accord *Steele*, 168 N.W.2d at 787; *Rudolph*, 239 Iowa at 374, 30 N.W.2d at 486. The Iowa Supreme Court has instructed that: "[t]he only question in a forcible entry and detainer action is whether the defendant is wrongfully detaining possession of the real property at the time of the trial." *Rogers*, 519 N.W.2d at 811 (citing *Rudolph*, 239 Iowa at 375, 30 N.W.2d at 486).

■ Here, only the third ground is at issue: whether Kaydon is holding the real estate in question contrary to its lease with ACI. Where lease violations form the basis for the forcible entry and detainer action, the Iowa Supreme Court has observed that: "[S]ubstantial compliance with the terms of the lease will avoid a forfeiture..." *Beck*, 260 Iowa at 697, 150

N.W.2d at 659 (quoting *Bentler,* 258 Iowa at 1010, 141 N.W.2d at 552). The Iowa Supreme Court has further instructed that:

> " 'Generally equity is somewhat less strict than law in requiring performance by one who seeks to enforce a contract.' *Lautenbach v. Meredith,* 240 Iowa 166, 173, 35 N.W.2d 870, 874. 'Equity looks to the substance rather than the form, and seeks to prevent injustice.' *Cota Plastering Co. v. Moore,* 247 Iowa 972, 978, 77 N.W.2d 475, 478."

*Beck,* 260 Iowa at 697, 150 N.W.2d at 659 (quoting *Bentler,* 258 Iowa at 1010, 141 N.W.2d at 552). The court will turn next to address ACI's specific allegations of Kaydon's alleged defaults of the Lease.

### B. Analysis Of Kaydon's Alleged Defaults

#### 1. Items no longer claimed to constitute a default

Based on ACI's trial brief and arguments at trial, the court concludes that ACI is not asserting that the items contained in the following paragraphs of the Mefferds' February 26, 2001, letter constitute grounds for granting ACI's counterclaim for forcible entry and detainer: 3 (the missing two doors of the storage building); 4 (the condition of the ceiling panels and walls in the offices); 5 (the leaking roof in the upper offices); 9 (the inoperable air conditioners); 10 (the water damage to the lower level office floors and walls), and 11 (the placement of several signs on the premises without written approval from ACI). Therefore, ACI's counterclaim is denied as to each of these six grounds.

#### 2. Certificate of insurance requirement

■ ACI also asserts that Kaydon is in default under the Lease because it has not provided ACI with a certificate of insurance naming ACI as a "loss payee" or an "additional named insured." Kaydon counters that such a designation is not required under the terms of the lease. Kaydon further claims that because it has now provided ACI with a certificate of insurance any prior violation of the terms of the Lease do not warrant forfeiture of the Lease.

The Lease, itself, provides, in relevant part that:

> 11. **Insurance** (a) Landlord and Tenant will each keep its respective property interests in the premises and its liability in regard thereto, and the personal property on the premises, reasonably insured against hazards and casualties; that is, fire and those items usually covered by extended coverage; and Tenant will procure and deliver to the Landlord a certification from the respective insurance companies to that effect. Such insurance shall be made payable to the parties hereto as their interests may appear. **TENANT SHALL PAY FOR ALL PREMIUMS FOR THE INSURANCE COVERAGE REQUIRED BY THIS LEASE, WHETHER LANDLORD'S OR TENANT'S RESPONSIBILITY.**

Lease at ¶ 11(a).

The Lease's insurance provision does not require Kaydon to obtain a certificate of insurance specifically naming ACI as a "loss payee" or an "additional named insured." Therefore, the failure of Kaydon to obtain a certificate of insurance containing these designations does not constitute a breach of the Lease.

■ The court does find that Kaydon violated Lease provision 11(a) by not providing a certificate of insurance to ACI until some time after April 1, 2001. This conclusion necessitates that the court de-

termine whether this breach of the Lease is sufficiently egregious to warrant granting ACI's counterclaim for forcible entry and detainer. The court concludes that it does not justify forfeiture of the lease. The court notes that Kaydon has remedied the default by obtaining and delivering to ACI a certificate of insurance on the Laurens property. Under similar circumstances, the Iowa Supreme Court has held that forfeiture is not required. *See Bentler*, 258 Iowa at 1011–12, 141 N.W.2d at 553. The Iowa Supreme Court held in *Bentler* that a tenant's failure to submit a suitable liability insurance policy to the landlord for approval every year during a 5–year lease did not justify forfeiture of the lease. *Id.* In *Bentler*, no insurance policy was presented to the landlord until almost two years after commencement of the lease, when the landlord first requested it. Then, when the insurance policy was renewed in subsequent years as required under the terms of the lease, it was never re-presented to the landlord. The Iowa Supreme Court concluded that: "Having been approved once, it was not necessary to resubmit it every year. If satisfactory insurance is in force, failure to submit it for inspection is such a minor matter, it would not justify forfeiture." *Id.* The court similarly finds here that Kaydon is in "substantial" compliance with the Lease's insurance provision and that its previous breach is so minor as to not warrant forfeiture.

### 3. *Acts causing increase in insurance rates*

■ ACI next contends that Kaydon is in default under the Lease because the installation of the paint system violates the Lease's prohibition on any tenant action which increases the costs of insurance on the Laurens facility.[6] Specifically, the Lease provides that:

> (b) Tenant will not do or omit the doing of any act which would vitiate any insurance, or increase the insurance rates in force upon the real estate improvements on the premises.

Lease at ¶ 11(b). ACI asserts that the new paint line violates this provision of the Lease because it's value will cause insurance rates for the facility to increase. ACI also contends that the new paint line represents a greater risk for environmental contamination than the previous paint line and, as a result, will carry higher insurance costs.

On this issue the court finds that ACI has failed to demonstrate that the new paint system will result in increased costs of insurance for the Laurens premises. The only evidence offered by ACI on this topic was the speculative testimony of Lloyd Mefferd that the new paint system represents a greater fire danger due to the furnace employed in the process to bake on the painted finish.[7] Lloyd buttressed this testimony with a non-specific assertion that he had once priced a similar paint system but that he had decided against such a system because "the insurance rates kept me from buying it." This assertion utterly fails to address the pertinent question here: whether the current insurance rate for the Laurens plant has been increased because of the addition of the new paint system.

---

6. The court notes that, under the terms of the Lease, any increase in insurance rates would be born exclusively by Kaydon. The Lease at ¶ 11(a).

7. The court notes that ACI presented no evidence that Lloyd has any expertise in the field of insurance other than that which comes from his being a business insurance customer for over twenty-five years.

The second prong of ACI's attack on this point is grounded on the premise that the new paint line represents an increased environmental risk. ACI supported this assertion with the speculative and unsubstantiated testimony of Lloyd Mefferd. In light of Howard Pohlman's persuasive testimony regarding the environmental safety measures contained in the new paint line, the court concludes that ACI has failed to establish that the new paint line carries an increased environmental risk that would cause the insurance rate of the Laurens plant to increase. Therefore, ACI's counterclaim is denied as to this ground.

### 4. Environmental hazards

■■■■■■■■ ACI further asserts that Kaydon is in default under the Lease because Kaydon has allowed spillages of cutting oils, water solubles, and paint solutions on the premises. ACI asserts that these actions constitute a violation of paragraph 6(d) of the Lease.[8] On this point, ACI offered the testimony of Floyd Mefferd as to possible environmental hazards he has observed on the Laurens premises. ACI presented evidence in the form of photographs taken by Floyd which purportedly show pollution at the Laurens plant caused by runoff from metal shavings, machine tools, and chemicals stored outside the production facility. The earliest of these photographs, such as Plaintiff's Exhibits 8, 11, and 12, are from May 31, 1998. Floyd testified that the conditions exhibited in the photographs continue to exist at the plant. In response, Kaydon offered the testimony of Howard Pohlman, the safety and environmental director at Kaydon's Hampton, Iowa facility. Pohlman testified that some of the conditions exhibited in ACI's photographs from 1998 have been rectified and that Kaydon is in full compliance with the environmental laws of the State of Iowa and the Federal government. The court finds that ACI has not proven that Kaydon is in violation of any of the environmental laws of the City of Laurens, the State of Iowa, or the United States.[9] ACI offered no scientific evidence which

---

8. Paragraph 6(d) of the Lease provides:
 (d) Tenant will make no unlawful use of said premises and agrees to comply with all valid regulations of the Board of Health, City Ordinances or applicable municipality, the laws of the State of Iowa and the Federal government, but this provision shall not be construed as creating any duty by Tenant to members of the general public. If Tenant, by the terms of this lease is leasing premises on the ground floor, it will not allow trash of any kind to accumulate on said premises in the halls, if any, or the alley or yard in front, side or rear thereof, and it will remove snow and ice and other obstacles from the sidewalk and parking area on or abutting the premises, if premises include the ground floor, and if this lease may be fairly construed to impose such liability on the Tenant.
 The Lease at ¶ 6(d).

9. In assessing the credibility of the testimony of the witnesses at the evidentiary hearing, the court has considered the following factors: (1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor or manner while testifying; (4) the witness's tendency to speak truthfully or falsely, including the probability or improbability of the testimony given; (5) the witness's situation to see and observe; (6) the witness's apparent capacity and willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case. See United States v. Phillips, 522 F.2d 388, 391 (8th Cir.1975); see also United States v. Merrival, 600 F.2d 717, 719 (8th Cir.1979); Clark v. United States, 391 F.2d 57, 60 (8th Cir.), cert. denied, 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); MANUAL OF MODEL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT 3.03 (1999). Upon consideration of these factors here, the court finds the testimony of Pohlman to be more credible on the issue of the existence of environmental hazards at the Laurens facility.

would establish that the materials or conditions shown in the photographs constitute an environmental danger let alone a violation of law. For example, Plaintiff's Exhibit 16 shows an open barrel with a green liquid in it. ACI, however, offered no evidence of the chemical makeup of this liquid.

■■■ Alternatively, even if the court were to assume, arguendo, that ACI had established that the conditions shown in ACI's photographic exhibits constitute a violation of the Lease, the court concludes that this portion of ACI's forcible detainer and entry action is barred under Iowa Code § 648.18 by Kaydon's thirty-days of peaceable possession. Section 648.18 provides: "Thirty days' peaceable possession with the knowledge of the plaintiff after the cause of action accrues is a bar to this proceeding." The Iowa Supreme Court has observed that:

> We have previously held that "peaceable possession" means undisputed or uncontested possession. *Thomas v. Brodsack,* 215 N.W.2d 503, 505 (Iowa 1974); *Rudolph v. Davis,* 237 Iowa 1383, 1386, 25 N.W.2d 332, 334 (1946). "But possession is neither disputed nor contested in the absence of an actual affirmative step at ouster." *Thomas,* 215 N.W.2d at 505 (emphasis added). "Mere assertion of a rival claim is insufficient." *Id.*
>
> We have repeatedly held the service of a three-day notice to quit does not interrupt peaceable possession. *See*

*Warren v. Yocum,* 223 N.W.2d 258, 263 (Iowa 1974); *see also Roshek Realty Co. v. Roshek Bros. Co.,* 249 Iowa 349, 358–60, 87 N.W.2d 8, 14–15 (1957); *McRobert v. Bridget,* 168 Iowa 28, 33–34, 149 N.W. 906, 908 (1914); *Heiple v. Reinhart,* 100 Iowa 525, 530, 69 N.W. 871, 873 (1897). Nor is peaceable possession disrupted by a landlord's assumption that the lease has terminated. *See Roshek,* 249 Iowa at 359–60, 87 N.W.2d at 14–15.

*Petty,* 584 N.W.2d at 307.

Here, the conditions which ACI complains are violative of the Lease have existed since May of 1998, over three years before this forcible entry and detainer action was filed. Thus, under Iowa Code § 648.18, ACI's right of action for these violations is barred.[10]

### 5. *Damages to wall*

■■■ ACI also contends that Kaydon is in default under the Lease because Kaydon has permitted damage to the west wall of the Laurens facility. ACI asserts that these actions constitute a violation of paragraph 6(b) of the Lease.[11] It is uncontested that the west wall of the facility has suffered some damage due to being struck by forklifts during the movement of materials. There has been no showing that this damage was done maliciously. Rather, it appears that the damage occurred due to the tight confines in which the forklifts

---

10. The court's conclusion that section 648.18 bars this portion of ACI's forcible entry and detainer counterclaim does not leave it without any remedy to recover its property. *See* IOWA CODE § 648.17 (forcible entry and detainer remedy not exclusive). As the Iowa Supreme Court has observed: "The bar of section 648.18 applies only to summary actions for forcible entry and detainer under chapter 648 and does not preclude ordinary actions for possession of real estate which may be brought under chapter 646 (recovery of real

property)." *Petty,* 584 N.W.2d at 308 (citing *Thomas,* 215 N.W.2d at 504).

11. Paragraph 6(b) provides:

(b) **DUTY OF CARE AND MAINTENANCE OF STRUCTURE.** Tenant will keep the roof, structural part of the floor, walls and other structural parts of the building in good repair.

The Lease at ¶ 6(b).

operate. Moreover, the court finds that some of the damage was preexisting at the time Kaydon began operations at the Laurens facility. The court finds that ACI has failed to demonstrate that this damage is so unusually pervasive for such a facility as to constitute a violation of this lease provision.

Alternatively, the court notes that all of the damage done to the wall can be rectified by replacing the damaged metal panels. At the end of the lease Kaydon is obliged to restore the Laurens facility to "good and clean condition." If Kaydon fails to do so, ACI can recover damages at law. Therefore, the court concludes that ACI has adequate remedies at law such that forfeiture of the lease is unwarranted.

### 6. Unauthorized alterations or modifications

The court will next take up ACI's assertions that Kaydon is in default for violating a provision in the Lease requiring prior authorization "for structural alterations or improvements" made to the Laurens premises. These claims are detailed in the following paragraphs of the Mefferds' letter of February 26, 2001: 1 (the concrete pad); 2 (the storage shed being used to house metal boxes for the storage of shavings and scrap metal); 7 (the 5 foot door opening cut through the wall of the main building); 8 (the 5 foot door opening cut through the wall of the main building); 12 (the removal of 70 feet of the south wall); 13 (opening for a vent fan cut through the south wall); 14 (holes drilled through the floor of the south bay); 15 (holes cut through the roof of the south bay), and 16 (attachments of steel beams, poles, and electrical conduit made for the new paint system).

Kaydon contends that none of the items listed in the Mefferds' February 26 letter constitute "structural alterations or improvements" thus requiring ACI's prior written consent. Kaydon argues that given the language of the lease agreement, Kaydon was not required to seek ACI's prior written consent for any changes. This argument is premised on Kaydon's reading of the Lease's language. Kaydon claims that the Lease's pertinent language should be read "as a conjunctive adjectival clause with 'structural' modifying not only 'alterations', but also 'improvements', thus requiring Kaydon to obtain prior written consent only for structural alterations or 'structural' improvements." Kaydon's Trial Br. at p. 11.

Under Iowa law, "[b]ecause leases are contracts as well as conveyances of property, ordinary contract principles apply." *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001); *accord Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997). When the dispute concerns the meaning of certain lease terms, the court must engage in the process of interpretation, rather than construction. *Walsh*, 622 N.W.2d at 503; *see Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (noting that interpretation is "a process for determining the meaning of words in a contract" while construction is "a process of determining the legal effect of such words."); *Fashion Fabrics of Iowa v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978) ("Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect."). The Iowa Supreme Court has explained that:

> The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co.*, 602 N.W.2d at 797. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." Re-

statement (Second) of Contracts § 202 cmt. a, at 87 (1981). In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. *Hartig Drug Co.*, 602 N.W.2d at 797. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.*

Once an ambiguity is identified, the court must then "choos[e] among possible meanings." Restatement (Second) of Contracts § 202 cmt. a, at 87. If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact. *Fausel,* 603 N.W.2d at 618.

*Walsh,* 622 N.W.2d at 503.

 With these rules in mind, the court turns to the language of the Lease. Here, an ambiguity is generated as to whether "structural" modifies only the noun "alterations" or whether it also modifies the noun "improvements." It is plain that the adjective "structural" modifies both the noun "improvements" as well as "alterations." Given the size and complexity of the manufacturing facility in Lauren, which is the sole object of the Lease, to read the clause otherwise would result in the patently absurd situation that the tenant of a large manufacturing facility would be required to notify and obtain the landlord's written permission for any "improvement" made to the premises, no matter how trivial. This clearly could not have been the intent of the parties. Having resolved this ambiguity in the Lease, the court turns to address the question of whether Kaydon violated this provision of the Lease. The court will take up *seriatim* each of the alleged violations as they

appear in the Mefferds' letter of February 26, 2001.

### a. The concrete pad

Because the Lease does not define the terms "structural," "alteration," or "improvement," the court will give these terms their normal meaning. *See Dickson,* 567 N.W.2d at 430 ("In interpreting a contract, we give effect to language of the entire contract in accordance with its commonly accepted and ordinary meaning."). The term "improvement" has been defined as:

A valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally has reference to buildings, but may also include any permanent structure or other development, such as street, sidewalks, sewers, utilities, etc. An expenditure to extend the useful life of an asset or to improve its performance over that of the original asset.

BLACK's LAW DICTIONARY at 757 (6th ed.1990). A pertinent definition of the adjective "structural" is: "of, or relating to, or affecting structure [stability]." MARIAM WEBSTER's COLLEGIATE DICTIONARY at 1167 (10th ed.1993). The term "structural alteration" has been defined as:

One that affects a vital and substantial portion of a thing; that changes its characteristic appearance, the fundamental purpose of its erection, and the uses contemplated. One that is extraordinary in scope and effect, or unusual in expenditure.

BLACK's LAW DICTIONARY at 1423.

 Keeping these definitions in mind, the court concludes that the concrete pad

constitutes a structural improvement to the Laurens facility. In support of its position that the pad does not qualify as structural alteration or improvement, Kaydon points out that the pad may be demolished at the end of the lease. The fact that the pad may be demolished is not determinative. The pad is not a temporary structure with a finite period of use but is instead a structure which may be used for the foreseeable future at the facility. Thus, the court finds that the pad constitutes a structure of a permanent nature that will tend to increase the value of the property and comprises a structural improvement to the Laurens facility. Because Kaydon did not obtain permission before constructing the concrete pad, the court finds that Kaydon violated Lease provision ¶ 6(c). This conclusion requires that the court determine whether this breach of the Lease is sufficiently egregious to warrant granting ACI's counterclaim for forcible entry and detainer. The court will address this question after examining the other alleged breaches of Lease provision ¶ 6(c).

#### b. The storage shed

█ The court likewise finds that the construction of the storage shed to be a structural improvement to the Laurens facility. Like the concrete pad, the shed is not a temporary structure but was instead built to be used for an infinite period at the facility. Kaydon violated Lease provision ¶ 6(c) by not obtaining written permission from ACI prior to its construction. Again, the court will address whether this breach of the Lease is sufficiently serious to require granting ACI's counterclaim for forcible entry and detainer after examining the remaining alleged breaches of Lease provision ¶ 6(c).

#### c. The door openings

█ ACI also contends that Kaydon violated Lease provision ¶ 6(c) by not ob-

taining written permission from it before cutting the two door openings in the plant. Kaydon argues that the two door openings do not constitute structural alterations or structural improvements. The court finds that the two door openings constitute structural alterations to the Laurens facility. The court notes that the door openings required not only the removal of the metal to make the doorways but also the removal of two metal girts. Kaydon's own witness, Ronald Hersom, testified that the girts provide some structural support for the building. The opening of the two doorways also changed the internal dynamics of the building. Thus, the court finds that these two doorways constitute structural alterations and that Kaydon violated Lease provision ¶ 6(c) by not obtaining written permission from ACI prior to constructing the doorways. The court will address whether this breach of the Lease is sufficiently serious to require granting ACI's counterclaim for forcible entry and detainer after examining the remaining alleged breaches of Lease provision ¶ 6(c).

#### d. The removal of a section of wall

█ ACI further asserts that Kaydon violated Lease provision ¶ 6(c) by not obtaining written permission from it before removing approximately 70 feet of interior wall from the center bay in order to accommodate the rail system for the new paint line. As was the case with the doorways, the court finds that the wall section's removal constitutes a structural alteration to the Laurens facility. The wall section's removal, like the doorways, required not only the removal of the metal making up the section of the wall but also the removal of at least two metal girts. The court finds that the removal of the wall section is a structural alteration which required Kaydon to obtain ACI's written permission

prior to undertaking it. Again, the court will address whether this breach of the Lease is sufficiently serious to require granting ACI's counterclaim for forcible entry and detainer after examining the remaining alleged breaches of Lease provision ¶ 6(c).

### e. *Modifications to the facility for new paint line*

 Finally, ACI asserts that Kaydon has violated Lease provision ¶ 6(c) by the modifications made for new paint line, i.e. the drilling of holes into the floor and the attachments of steel beams, poles, and electrical conduit. The modifications for the new paint line necessitated drilling through the main support beams in the plant in order to run electrical conduit and also involved drilling approximately 200 holes through the floor in order to secure the new paint line. Lars Hersom, the manager of the Laurens facility, testified that the holes drilled in the main support beams in the plant could effect the strength of the beams. This testimony was uncontested and no other witness offered contrary testimony.[12] The court finds that this modification substantial enough to constitute a structural alteration which required Kaydon to obtain ACI's written permission prior to undertaking it. The court similarly finds that the holes drilled through the floor of the structure, given the large number of holes which perforate the floor of the building,

constitute a structural alteration. The support poles required for the new paint line, however, do not constitute a structural alteration because the beams serve only to support the new paint line and, with the exception of anchor bolts being drilled into the floor, are independent of the structure.[13]

The court turns now to address whether this breach and the other breaches of Lease provision ¶ 6(c) necessitate the granting of ACI's counterclaim for forcible entry and detainer.

### C. *Analysis Of Whether Forfeiture Required*

As noted above, the Iowa courts have held that substantial compliance with the terms of the lease will avoid a forfeiture. *Beck,* 260 Iowa at 698, 150 N.W.2d at 659; *Bentler,* 258 Iowa at 1010, 141 N.W.2d at 552. The reported decisions of the Iowa Supreme Court reveal no cases in which forfeiture of a lease was required due to the tenant making unauthorized alterations or modifications to the leased premises.[14] Therefore, the court turns to the reported decisions of other state courts to access Kaydon's breaches of the Lease here. A review of such decisions reveals that courts have been extremely reluctant to grant a forfeiture of a lease due to a tenant's making of alterations or modifications to leased premises without the landlord's prior permission. *See Lake Anne Realty Corp. v. Sibley,* 154 A.D.2d 349, 545

---

**12.** The court notes that Ron Hersom testified that the holes in the beams would not effect the structural stability of the facility as a whole. He was not asked about the effect the holes would have on the individual beams.

**13.** The court finds that the hole made in the roof for a vent does constitute a structural alteration because repair of the hole would require taking the whole roof system off.

**14.** In *Bentler,* the Iowa Supreme Court never had to address whether forfeiture was war-

ranted because it held that the tenant's installation of a dishwasher and a removable gas furnace in a restaurant and his cutting a hole in the roof of the building for a vent did not constitute "additional improvements" or "remodeling" within the lease provision that required that additional improvements and remodeling be agreed upon by the parties in writing. *Bentler,* 258 Iowa at 1010–11, 141 N.W.2d at 552.

N.Y.S.2d 828, 830 (N.Y.App.Div.1989) (holding that the granting of a forfeiture after the tenant's expenditure of $7,000 for improvements for a porch and an additional room to a vacation cottage would be unduly harsh, in light of the fact that the condition complained of was not hazardous); *Goldblum v. C & C Investments*, 444 So.2d 642, 643 (La.Ct.App.1983) (refusing to cancel lease where tenant removed a wall to open a 12–foot wide passageway between the leased site and an adjacent area in order to enlarge the business area in the two premises), *cert. denied*, 447 So.2d 1078 (La.1984); *Harar Realty Corp. v. Michlin & Hill, Inc.*, 86 A.D.2d 182, 449 N.Y.S.2d 213, 218 (N.Y.App.Div.) (holding that it was error to conclude that the installation of a staircase was a material breach of the lease entitling the landlord to possession of the premises), *appeal dismissed*, 57 N.Y.2d 836, 455 N.Y.S.2d 763, 442 N.E.2d 60 (N.Y.1982); *Louis & Anne Abrons Foundation, Inc. v. 29 East 64th Street Corp.*, 78 A.D.2d 814, 433 N.Y.S.2d 132, 133–34 (N.Y.App.Div.1980) (holding that subtenant's installations of signs, gates, and canopies without the approval of the landlord were inconsequential breaches that did not warrant forfeiture of the lease and sublease); *Pollock v. Adams* 548 S.W.2d 239, 242 (Mo.Ct.App.1977) (holding that tenant's erection of a temporary partition and installation of a hasp for a padlock on an office door of premises leased for a restaurant were not substantial enough violations of the lease to warrant a forfeiture); *Sabema Corp. v. Sunaid Food Products, Inc.*, 309 So.2d 620, 622 (Fla.Ct.App.1975) (holding that tenant's failure to obtain written consent to repair and replace oil drainfields and soakage pits did not constitute a material breach of lease where improvements were made of necessity due to demand by pollution board to remedy existing conditions on premises); *Fly Hi Music Corp. v. 645 Restaurant*

*Corp.*, 64 Misc.2d 302, 304, 314 N.Y.S.2d 735, 738 (N.Y.City Civ.Ct.1970) (refusing to evict tenant where tenant installed a new stairway, kitchen and raised platform even though alterations had been undertaken without a permit since the work had been long completed, represented an improvement to the premises, and enhancement to its value), *aff'd*, 71 Misc.2d 302, 335 N.Y.S.2d 822 (N.Y.App.Term 1972).

■■■■ Several principles can be distilled from these state court decisions. First, where the covenants of the lease are substantially performed and no substantial injury results to landlord from the failure to comply strictly, the tenant should not be subject to the severity of a forfeiture. The Iowa Supreme Court recognized this rule of equity in *Bentler*, 258 Iowa at 1010, 141 N.W.2d at 552 ("Although our cases have not said in so many words that substantial compliance with the terms of the lease will avoid a forfeiture, the language of the cases supports that statement."). This is in keeping with Iowa's general principle that equity abhors forfeitures. *Chicago R.I. & P.R. Co. v. City of Iowa City*, 288 N.W.2d 536, 541 (Iowa 1980); *Collins v. Isaacson*, 261 Iowa 1236, 1242, 158 N.W.2d 14, 17 (1968); *Bentler*, 258 Iowa at 1012, 141 N.W.2d at 553; *Roshek Realty Co. v. Roshek Bros. Co.*, 249 Iowa 349, 358, 87 N.W.2d 8, 13 (1957); *accord Brown v. Nevins*, 499 N.W.2d 736, 738 (Iowa Ct. App.1993). Here, the court finds that Kaydon is in substantial compliance with the terms of the Lease. While the court has found several violations of Lease provision ¶ 6(c), these violations were not committed in willful noncompliance with the terms of the Lease but due to the fact that the manager of the Laurens facility did not know about the requirement that all "structural alterations or improvements" had to have prior approval from ACI. Moreover, the court concludes that ACI

has not suffered a substantial injury to its interests as a result of Kaydon's beaches of the terms of the Lease. Upon termination of the Lease, any benefit allegedly lost by ACI can be adequately recovered at law in the form of damages from Kaydon. Kaydon is obliged under the terms of the Lease to restore the Laurens facility to "good and clean condition." If Kaydon fails to do so and ACI can demonstrate that it has suffered damages because of Kaydon's actions, ACI can seek relief at law. Therefore, the court concludes that these factors weigh against granting ACI's counterclaim.

Two other factors that courts have looked to in determining whether to grant a forfeiture for failure to obtain permission from the landlord prior to making alterations or modifications to the leased premises are whether the alterations were in keeping with the purpose for which the premises was originally leased and whether the alterations constituted an improvement to the premises and enhanced the premise's value. The facts of this case stand in stark contrast to those found in *Feist & Feist v. Long Island Studios, Inc.*, 29 A.D.2d 186, 287 N.Y.S.2d 257 (N.Y.App. Div.1968). In *Feist,* the tenant remodeled the premises, which had been leased solely as a motion picture studio, at an expenditure of much more than the authorized limit, and subsequently used the premises as a discotheque. The court in *Feist* held the tenant to be in violation of material conditions of the lease, entitling the landlord to forfeiture because the violations were "deliberately and consciously created," without the required permission of the landlord. Here, the structural alterations and modifications to the Laurens plant have all been in keeping with the purpose for which the premises was leased, the making of hydraulic cylinders. Moreover, Kaydon has spent over $1,000,000 on structural alterations or improvements and fixtures to the Laurens facility. Therefore, the court also concludes that these factors weigh against granting ACI's counterclaim.

The court concludes that forfeiture of the lease is an unduly harsh remedy in this case and one which equity does not demand because the violations of the Lease were not deliberately and consciously created, the landlord has not suffered substantial injuries and has available to it adequate remedies at law, the alterations and improvements made by the tenant were in keeping with the purpose for which the premises was originally leased, and the alterations constituted an improvement to the premises which has enhanced the premise's value. Therefore, ACI's counterclaim for forcible entry and detainer against Kaydon is denied.

## IV. CONCLUSION

Initially, the court concludes that Kaydon violated Lease provision ¶ 11(a) by not providing a certificate of insurance to ACI until some time after April 1, 2001. The court, however, further finds that this breach of the Lease is not sufficiently egregious to warrant granting ACI's counterclaim for forcible entry and detainer. The court also finds that ACI has failed to demonstrate that the new paint system will result in increased costs of insurance for Laurens premises. Therefore, that portion of ACI's counterclaim premises on the allegation at Kaydon is in default under the Lease because the installation of the paint system violates the Lease's prohibition on any tenant action which increases the costs of insurance on the Laurens facility is denied. The segment of ACI's counterclaim premised on the allegation that Kaydon is in default under the Lease because Kaydon has allowed spillages of cutting oils, water solubles, and paint solutions on the premises in violation of

paragraph 6(d) of the Lease is also denied. The court finds that ACI has not proven that Kaydon is in violation of any of the environmental laws of the City of Laurens, the State of Iowa, or the United States. Alternatively, the court concludes that this portion of ACI's forcible detainer and entry action is barred under Iowa Code § 648.18 by Kaydon's thirty-days of peaceable possession. The court also concludes that ACI has failed to demonstrate that Kaydon is in default under the Lease because Kaydon has permitted damage to the west wall of the Laurens facility. The court finds that ACI has failed to demonstrate that this damage is so unusually pervasive for such a facility as to constitute a violation of this lease provision. Finally, with respect to that portion of ACI's counterclaim in which ACI asserts that Kaydon is in default for violating a provision in the Lease requiring prior authorization "for structural alterations or improvements" made to the Laurens premises, the court concludes that while Kaydon has breached Lease provision ¶ 6(c), those breaches do not require the granting of ACI's counterclaim for forcible entry and detainer. Rather, the court finds that Kaydon is in substantial compliance with the terms of the Lease. Therefore forfeiture is not warranted at this time and ACI's counterclaim for forcible detainer and entry action is **denied**.

**IT IS SO ORDERED.**